IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEROY STERLING, | : |
| Plaintiff, | : |
| v. | : CIVIL ACTION NO. 10-2406 |
| REDEVELOPMENT AUTHORITY OF THE CITY OF PHILADELPHIA *et al.*, | : |
| Defendants. | : |

**MEMORANDUM**

YOHN, J.                                                                                           July 27, 2011

      Leroy Sterling brings this action against the Redevelopment Authority of the City of Philadelphia, the Philadelphia Authority for Industrial Development, the City of Philadelphia, and Crane Arts, LLC. Currently pending is the City's motion to dismiss the claims against it under Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, I will grant the City's motion.

**I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]**

      This case arises from a dispute regarding property that was conveyed to Sterling as part of a plan for the development of the North Philadelphia Redevelopment Area.

---

[1] The following summary is based on the allegations in Sterling's complaint, which I assume to be true for purposes of the City's motion to dismiss, *see Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009), as well as the agreements at issue in this case, which Sterling attached to his complaint, *see Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (asserting that a court may properly consider an undisputedly authentic document upon which the complaint is based).

The Redevelopment Authority of the City of Philadelphia (the "RDA") is a "public body and a body corporate and politic" that was created under Pennsylvania's Urban Redevelopment Law, 35 Pa. Stat. §§ 1701 *et seq*. *See* 35 Pa. Stat. § 1703(a). The RDA is authorized, among other things, to acquire property by purchase, gift, or eminent domain; to lease and sell property; and to plan and contract with private, corporate, or governmental redevelopers, for the purpose of the elimination of blighted areas and the redevelopment of such property. *See id.* § 1701; *see also id.* § 1709.

The Philadelphia Authority for Industrial Development ("PAID") is a public authority incorporated by the City of Philadelphia (the "City") pursuant to the Economic Development Financing Law, 73 Pa. Stat. §§ 371 *et seq.*

On August 22, 2002, the RDA entered into a redevelopment agreement with PAID, under which PAID was to develop property located at 1425–43 North American Street in Philadelphia. (Compl. ¶ 6–7.) The agreement provided that PAID was to begin the development of the property within three months and was to complete the development within eighteen months. (Compl. Ex. A ("Redevelopment Agreement") ¶ 3.7.) PAID was responsible for securing and paying for any required permits, licenses, approvals, and variances, but the RDA agreed to assist PAID in securing them. (*Id.* ¶ 3.6.) The agreement granted the RDA a "right of re-entry"; in the event of default, including PAID's failure to complete the development of the property in the time specified in the agreement, the RDA could, after proper notice to PAID and PAID's failure to cure the default in the specified time, "enter into the Premises or any appurtenant easement and, by this entry terminate the estate that had been conveyed by the [RDA] to [PAID] by such deed and revest title to the Premises or any appurtenant easement in the [RDA] absolutely." (*Id.* ¶ 5.5.)

The RDA conveyed the property located at 1425–43 North American Street to PAID by deed on September 10, 2002. (Compl. ¶ 8.)

Sterling alleges that he agreed with the RDA, PAID, and the City (collectively, the "municipal defendants") to develop the property as a yard for cement masonry work and to create and develop a training program for cement mason workers. (*Id.* ¶ 13.) According to Sterling, the municipal defendants promised that "they would procure contracts for masonry work for [him] to assist him in successfully operating his enterprise and his training program." (*Id.* ¶ 14.)

On September 10, 2002, PAID assigned its rights and obligations under the Redevelopment Agreement with the RDA to Sterling. (*Id.* ¶ 15.) "Induced by the promises of assistance and support" from the municipal defendants (*id.* ¶ 15), Sterling agreed, in an Amendatory Agreement with the RDA and PAID, to "assume and perform all of the terms and conditions[,] obligations and requirements contained in the Redevelopment Agreement between the PIDC[2] and the [RDA]" (*Id.* Ex. C ("Amendatory Agreement") ¶ 2). On the same date, PAID conveyed the property by deed to Sterling for $10,821. (*Id.* ¶ 17.)

Sterling asserts that he "expended a considerable sum of money in attempting to comply with the development schedule, including funds for architects, engineers, and maintenance of the site," but that the municipal defendants' failure to cooperate with him prevented him from

---

[2] The acronym "PIDC" is not defined in the Amendatory Agreement, but it presumably refers to the Philadelphia Industrial Development Corporation, "a private, not-for-profit Pennsylvania corporation" that manages PAID. PIDC—About Us, http://www.pidc-pa.org/about-us (last visited July 15, 2011). The reference to PIDC in this provision appears to be a drafting error, since the Amendatory Agreement is otherwise clear that the referenced redevelopment agreement is the August 22, 2002, agreement between the RDA and PAID.

completing the development within the eighteen-month time period specified in the Redevelopment Agreement. (*Id.* ¶¶ 23–24.)

Sterling alleges, "on information and belief," that sometime in 2006, about three to four years after he entered into the Amendatory Agreement with the RDA and PAID, the municipal defendants had discussions with other prospective owners who were interested in the property. (*Id.*. ¶ 25.) During the summer of 2006, the president of defendant Crane Arts, LLC, allegedly told Sterling that he wanted the property and that he knew Vincent Dougherty, an employee in the City's Department of Commerce who was "charged with the development of the area of which the Premises were a part, and who was involved in the process of monitoring [Sterling's] completion of [the] construction schedule." (*Id.* ¶ 26.) Sterling asserts that "[a]t various times in 2006, employees of [the municipal defendants], including but not limited to Vincent Dougherty, began pressuring [him] to complete the work on the Premises, employing extraordinary means including but not limited to calling [him] at his residence, to exert pressure." (*Id.* ¶ 27.)

According to Sterling, sometime in 2006 the municipal defendants, "after mutual consultation," agreed to issue a notice of default to Sterling. (*Id.* ¶ 28.) And on November 2, 2007, more than five years after Sterling entered into the Amendatory Agreement with the RDA and PAID, the RDA deeded the property back to itself under its right of re-entry,[3] "on the pretext," Sterling alleges, that he "had not performed the duties under the agreements in a timely manner." (*Id.* ¶ 29.) Sterling alleges that the RDA took his title to the property "[w]ithout legal authority, without notice to [him], or any opportunity for a hearing" and "with the approval and

---

[3] More specifically, the deed was from the RDA "as attorney in fact under certain provisions of a Redevelopment Agreement dated August 22, 2001," to the RDA. (Compl. Ex. E.) (The stated date of the Redevelopment Agreement is apparently a typographical error.)

complicity" of the municipal defendants. (*Id.*) Sterling alleges that the municipal defendants did not reimburse him for his purchase price of the property or compensate him for the expenditures he made in attempting to complete the development of the property. (*Id.* ¶ 31.)

On September 22, 2009, almost two years after the property was deeded back to the RDA, the RDA conveyed the property to defendant Crane Arts, LLC. (*Id.* ¶ 32.)

Sterling filed this action in the Court of Common Pleas for Philadelphia County on April 15, 2010, and on May 20, 2010, the City, with the consent of all the defendants, removed the action to this court.

Sterling asserts four counts. In count I, brought under 42 U.S.C. § 1983, Sterling alleges that the municipal defendants violated the due-process clause of the Fourteenth Amendment. In count II, Sterling asserts breach-of-contract claims against the municipal defendants. Sterling alleges that the RDA breached the Redevelopment Agreement by deeding the property back to itself, by failing to render assistance to Sterling as required under the agreement, and by providing property unsuitable to the contemplated development. Sterling alleges that PAID breached the Amendatory Agreement by conveying property to him that was unsuitable for development. And Sterling alleges that the City breached an implied contract in which the City agreed to assist and support the development of the property. In count III, Sterling asserts a claim of conversion against the RDA. And finally, in count IV, Sterling asserts a claim for equitable ejectment against Crane Arts.

After the parties had the opportunity to conduct limited discovery, the City filed a motion to dismiss the claims against it for failure to state a claim under Rule 12(b)(6).

## II. STANDARD OF REVIEW

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Factual allegations "that are 'merely consistent with' a defendant's liability," or that permit the court to infer no more than "the mere possibility of misconduct" are not enough. *Id.* at 1949–50 (quoting *Twombly*, 550 U.S. at 557). Rather, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. In evaluating a motion to dismiss, "the factual and legal elements of a claim should be separated." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11; *see also Iqbal*, 129 S. Ct. at 1950 (asserting that a court should assume the veracity of well-pleaded factual allegations, but legal conclusions "are not entitled to the assumption of truth"). And the court must draw all reasonable inferences in favor of the plaintiff. *See McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009).

## III. DISCUSSION

Sterling brings two counts against the City, the first under section 1983, and the second under state law for breach of contract.

### A. Count I: Section 1983

To state a section 1983 claim, a plaintiff must demonstrate that the defendant, acting under color of state law, deprived him of a right secured by the Constitution or the laws of the United States. *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006).

Sterling alleges that the City violated the due-process clause of the Fourteenth Amendment by depriving him of his property without due process of law. In seeking to dismiss this claim, the City argues that Sterling's section 1983 claim is barred by *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and that, in any event, Sterling has failed to state a claim for a violation of either substantive or procedural due process. Because I agree that, under *Monell*, Sterling's allegations are not sufficient to hold the City liable under section 1983, I will grant the City's motion to dismiss this claim against it.[4]

Although a municipality such as the City may be subject to liability under section 1983, such liability may not be predicated on the theory of *respondeat superior*. *See Monell*, 436 U.S. at 690–91. A municipality cannot be held liable under section 1983 "unless *deliberate* action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 400 (1997) (quoting *Monell*, 436 U.S. at 694). A plaintiff seeking to impose liability on a municipality under section 1983 must thus "identify a municipal 'policy' or 'custom' that caused [his] injury." *Id.* Here, Sterling has failed to identify either a policy or a custom of the City that led to the alleged deprivation of his property without due process.

---

[4] Accordingly, I need not address whether Sterling has otherwise stated a due-process claim.

Sterling alleges that the City "had general supervisory and review powers over development of the area involved" (Compl. ¶ 10) and was complicit in the RDA's termination of his interest in the property and its deeding of the property back to itself. He does not, however, allege any facts to support these conclusory allegations against the City. Moreover, it is well established that the RDA is a "completely separate entity" from the City. *Herriman v. Carducci*, 380 A.2d 761, 763–64 (Pa. 1977); *see also* 35 Pa. Stat. § 1704(a) (providing that a redevelopment authority "shall in no way be deemed to be an instrumentality of [a] city or county, or engaged in the performance of a municipal function"). As the Pennsylvania Supreme Court has explained, "[a]n authority under the Urban Redevelopment Law is an agent of the Commonwealth and not of the local government body. As can be seen, the legislature in no uncertain terms has made it clear that a redevelopment authority is a completely separate entity from the city." *Herriman*, 380 A.2d at 763–64 (citation omitted).

And even to the extent that employees (or at least one employee) of the City were, as Sterling alleges, complicit in the RDA's decision to deed the property back to itself, there is nothing in Sterling's complaint to suggest that such complicity was pursuant to a municipal policy or custom.

"Policy is made when a decisionmaker possessing final authority to establish a municipal policy with respect to the action issues an official proclamation, policy, or edict." *McTernan*, 564 F.3d at 658 (internal quotation marks and brackets omitted). Sterling, however, has not identified such an official proclamation, policy, or edict. Sterling is correct that, under certain circumstances, municipal liability may be imposed for a single decision by a municipal policymaker. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986); *see also Fletcher v.*

*O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989) ("A single incident violating a constitutional right done by a governmental agency's highest policymaker for the activity in question may suffice to establish an official policy."). But Sterling has not identified a policymaker whose alleged decision to encourage the RDA to terminate Sterling's interest in the property "may rightly be said to represent the official policy of the [City]." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 736 (1989). Sterling asserts that Vincent Dougherty, an employee of the City's Department of Commerce, "directed the actions of the other agencies and carried out the duplicitous and unfair policy described in Plaintiff's complaint." (Pl.'s Answer to Def. City of Philadelphia's Mot. to Dismiss ("Pl.'s Br.") at 8.) Although Sterling describes Dougherty as "an employee of the Defendant City's Department of Commerce charged with the development of the area of which the Premises were a part" (Compl. ¶ 26), nowhere in his complaint does Sterling allege that Dougherty possessed final decision-making authority. And as the Third Circuit has asserted, "[a] single incident by a lower level employee acting under color of law . . . does not suffice to establish . . . an official policy." *Fletcher*, 867 F.2d at 793.

Nor has Sterling sufficiently alleged the existence of a municipal custom. "A plaintiff may establish a custom . . . by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Watson v. Abington Township*, 478 F.3d 144, 155–56 (3d Cir. 2007). "[P]roof of knowledge and acquiescence by the decisionmaker" is required in order to establish a "custom." *McTernan*, 564 F.3d at 658. Here, Sterling has not alleged any facts beyond those pertaining to this particular incident that would suggest a well-settled custom of encouraging the RDA to (unlawfully) exercise its right of re-entry and terminate a redeveloper's property interest. *See Fletcher*, 867

F.2d at 793 ("A single incident by a lower level employee acting under color of law . . . does not suffice to establish . . . a custom.").

Sterling also alleges that the City engaged in a "pattern of wrongful conduct" as "part of a campaign of harassment and lack of cooperation" (Compl. ¶ 41) in which the City broke various promises it had made to assist him. But again, Sterling alleges no facts in his complaint that suggest that such "wrongful conduct" was the result of a municipal policy or custom of the City. Sterling alleges no other situations in which the City failed to cooperate with a redeveloper or undertook a campaign of harassment against a redeveloper, and he thus provides no basis for inferring that there was a well-settled custom of such conduct; nor does he allege any facts that would support an inference that "an official who has the power to make policy [was] responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (internal quotation marks omitted).

Because Sterling has not alleged sufficient facts to state a claim against the City under section 1983, I will grant the City's motion to dismiss this claim against it.

### B.    Count II: Breach of Contract

Sterling alleges that the City entered into an implied contract with him "to assist and support the development of the Premises pursuant to the Redevelopment Agreement" (Compl. ¶¶ 56), and claims that the City breached this implied contract by failing "to provide effective and timely assistance" and by failing "to procure contracts" for his cement mason business (*id.* ¶ 58). The City argues that Sterling has failed to state a claim for breach of contract because he has not pleaded the existence of a valid contract. I agree with the City and will therefore dismiss

this claim against it.

The City asserts that Sterling has not properly alleged the existence of a valid and enforceable contract with the City because his complaint is devoid of any averment that the alleged contract met the City's contracting requirements. "[T]he statutory requirements for execution of municipal contracts are mandatory." *City of Scranton v. Heffler, Radetich & Saitta, LLP*, 871 A.2d 875, 880 (Pa. Commw. Ct. 2005). "Where a municipality must execute a contract in a particular manner under legislative pronouncement, failure to comply with the pronouncement renders the contract unenforceable." *City of Scranton*, 871 A.2d at 880 (internal quotation marks omitted). As the City asserts, the Philadelphia Home Rule Charter provides that the City's Law Department "shall prepare or approve all contracts, bonds and other instruments in writing in which the City is concerned" and that "[i]t shall keep a proper registry of all such contracts, bonds and instruments." 351 Pa. Code § 4.4–400(c). Here, Sterling's complaint alleges only that he and the City entered into an "implied contract," and he apparently concedes in his brief that the alleged contract did not meet the statutory requirements for a City contract. Nonetheless, Sterling argues that his contract with the City can be implied in law under the doctrine of quasi-contract.

A quasi-contract claim is separate and distinct from a breach-of-contract claim, and to the extent that Sterling is asserting such a claim, he should have expressly pleaded it in his complaint. In any event, such a quasi-contract claim fails here.

"Quasi-contracts are contracts which are implied in law for reasons of justice." *Pittsburgh Baseball, Inc. v. Stadium Auth.*, 630 A.2d 505, 510 (Pa. Commw. Ct. 1993). "[I]n order to avoid results involving obvious injustice," Pennsylvania courts have held that "where a municipality

. . . has voluntarily accepted and retained the benefits of a contract which it had the power to make but which was defective in the method of its execution and consequently invalid, the party who . . . has conferred such benefits may recover compensation therefor in a suit, not on the invalid contract itself, but upon a quantum valebat, quantum meruit, or for money had and received." *J.A. & W.A. Hess, Inc. v. Hazle Township*, 400 A.2d 1277, 1279 (Pa. 1979) (internal quotation marks omitted). As the Pennsylvania Supreme Court explained, "[c]ommon honesty requires that a municipality or other governmental agency should not be allowed, any more than a private individual, wholly to repudiate an obligation of which it has deliberately appropriated the benefits, and, in such cases, if the municipality does not restore the property which it has received, an implied obligation to make compensatory payment for it arises." *Id.*

In *McGaffic v. City of New Castle*, 973 A.2d 1047 (Pa. Commw. Ct. 2009), the case on which Sterling relies, the City of New Castle and the Redevelopment Authority of the City of New Castle entered into a closeout agreement that required the city to assume the debts and liabilities of the redevelopment authority and allowed the city to directly receive funds from the U.S. Department of Housing and Urban Development ("HUD") that had previously been paid to the redevelopment authority. *See* 973 A.2d at 1050–51. Property owners, as third-party beneficiaries of the closeout agreement, filed suit against the city after it had refused to honor its obligation under the agreement to pay compensation owed to them by the redevelopment authority for the taking of their property. *See id.* at 1051. The city argued that the property owners could not pursue a breach-of-contract claim because, although the closeout agreement had been approved by the city council and signed by the mayor, it lacked the controller's signature, which was required by law. *See id.* at 1053. Although the Commonwealth Court found

that the closeout agreement was "irregularly executed," the court held that the agreement was enforceable because the city had ratified it. *See id.* at 1055–56 (concluding that the city had ratified the closeout agreement "through nonaction coupled with the acceptance of substantial direct benefits.").[5]

In a footnote, the court asserted that the doctrine of quasi-contract provided an alternative rationale for allowing the property owners to recover against the city. *See id.* at 1055 n.10. The court explained that the closeout agreement could be implied in law because HUD had redirected substantial funding from the redevelopment authority to the city and the city had "repeatedly accepted HUD funds . . . without objection from any City officials, including the City Controller," and because it would be "unjust to allow the City, over the course of several years, to enjoy [such benefits from the closeout agreement], only then to claim the agreement is unenforceable, thereby denying [the] Property Owners a remedy for their loss." *Id.*

---

[5] As the Commonwealth Court has asserted, "[i]t is well settled that a municipal corporation may ratify contracts which are within its corporate powers and made by its officers without authority, or in excess of their authority." *Eckert v. Pierotti*, 553 A.2d 114, 118 (Pa. Commw. Ct. 1989). "In other words, the municipality may waive an irregularity of a municipal contract and ratify that contract." *City of Scranton*, 871 A.2d at 881. "This ratification may be made by the affirmative action of the proper officials or by any action or inaction which, under the circumstances, amounts to an approval of the contract." *Id.* Mere inaction, however, is not sufficient for ratification. Rather, in cases claiming that a municipality ratified a contract through inaction, courts have required a showing that the municipality accepted benefits under the contract. *See McGaffic*, 973 A.2d at 1055.

Crucial to the court's analysis in *McGaffic* was its finding that the city "received a significant, direct benefit" from the closeout agreement—as the court explained, HUD redirected substantial funding from the redevelopment authority to the city. *Id.* at 1055. Also significant to the court was the fact that, when the closeout agreement was executed, it was the city's and the controller's practice to enter into all contractual arrangements without the controller's signature, which suggested to the court that the controller "consistently endorsed municipal contracts by nonaction." *See id.* at 1055–56 (noting that collective bargaining agreements, lease agreements, and automobile purchase agreements, including a purchase contract valued at $579,456.30, all lacked the controller's signature).

Here, however, unlike in *McGaffic*, Sterling has not alleged that he conferred any direct benefits upon the City in developing the property as specified under the Redevelopment Agreement with the RDA. Sterling was the owner of the property. And although the RDA ultimately exercised its right of re-entry and deeded the property back to itself, the RDA is a "completely separate entity" from the City and is not an agent of the City. *Herriman*, 380 A.2d at 763–64. Moreover, whereas in *McGaffic* the contract had been approved by the city council and signed by the mayor and the only defect was the controller's failure to sign the contract, here there is no allegation that anyone from the City was aware of the alleged contract—let alone had approved the contract—except a single City employee, Vincent Dougherty. There is thus no basis for implying a contract between Sterling and the City under the doctrine of quasi-contract.

Indeed, this case is more like *Pittsburgh Baseball*, in which the Commonwealth Court upheld the dismissal of the plaintiff's quasi-contract claim. *See* 630 A.2d 505. In that case, the plaintiff sought to enforce an oral promise by Pittsburgh's mayor to provide financial assistance in exchange for the plaintiff's agreement to purchase the Pittsburgh Pirates and keep the team in Pittsburgh. *See id.* at 507. The plaintiff argued that the city received benefits from the agreement in the form of taxes on ticket sales and fan spending on local goods and services. *See id.* at 509. The Commonwealth Court, however, concluded that any benefit conferred on the city was merely an indirect benefit, which was not sufficient to imply a contract under the doctrine of quasi-contract. *See id.* at 510.[6]

---

[6] The court similarly concluded that the city had not ratified the alleged agreement because "on the facts pleaded, [the city council's] failure to take action does not constitute 'nonaction which in the circumstances amounts to an approval of the contract'" and because the actions of the plaintiff "did not confer any direct benefits on the City." *See id.* at 509 (quoting

As in *Pittsburgh Baseball*, Sterling has failed to sufficiently plead that he has conferred any direct benefit on the City, and there is thus no basis for implying a contract between Sterling and the City under the doctrine of quasi-contract.

Because Sterling has not pleaded the existence of a valid contract with the City, and because there is no basis for implying a contract, I will dismiss the breach-of-contract claim against the City.

### III.   CONCLUSION

For the foregoing reasons, I will dismiss the claims against the City. An appropriate order accompanies this memorandum.

---

10A Eugene McQuillin, *The Law of Municipal Corporations* § 29.106 (3d ed.)).

Nor do the allegations in Sterling's complaint provide any basis for concluding that the City ratified the alleged contract here. "[W]here a previously unauthorized contract is retroactively ratified by post-contract approval, such post-contract ratification must be approved by 'everyone whose approval was [previously] required under applicable law.'" *Chainey v. Street*, 523 F.3d 200, 213 (3d Cir. 2008) (quoting *City of Scranton*, 871 A.2d at 881). In *Chainey*, a case in which the plaintiffs sought to enforce a contract allegedly entered into by the mayor of Philadelphia, the court concluded that the plaintiffs could not establish ratification because there was "no evidence of post-contract approval from . . . the City Law Department." 523 F.3d at 213; *see also City of Scranton*, 871 A.2d at 881 (holding that there was no ratification where there was no evidence that the city controller, whose signature on a contract was required under the city's administrative code, knew of the agreement and where there was no evidence that either the city council or the city solicitor had approved the agreement). Similarly, here, Sterling does not allege that the City's Law Department was even aware of the alleged contract, and the facts alleged by Sterling are not sufficient to support an inference that the Law Department's inaction amounted to approval of the contract. Moreover, because Sterling has not sufficiently alleged that the City received any direct benefits from this alleged contract, there is no basis for concluding that the City ratified the alleged contract.