IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| LEROY STERLING, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 10-2406 |
| | : | |
| REDEVELOPMENT AUTHORITY OF | : | |
| THE CITY OF PHILADELPHIA *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**MEMORANDUM**

YOHN, J.                                                December 13, 2011

Leroy Sterling filed this action against the Redevelopment Authority of the City of
Philadelphia (the "RDA"), the Philadelphia Authority for Industrial Development ("PAID"), the
City of Philadelphia (the "City"), and Crane Arts, LLC. I previously dismissed the City as a party
to this action. Now pending are the motions filed by the RDA and PAID for summary judgment
under Federal Rule of Civil Procedure 56, as well as their motion to exclude the report and
testimony of Sterling's damages expert. For the reasons that follow, I will grant in part and deny
in part the RDA's motion for summary judgment, and I will grant PAID's motion for summary
judgment. I will also grant the motion to exclude the expert report and testimony.

I.      **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]

This case arises from a dispute regarding property that was conveyed to Sterling as part of a plan for the development of the North Philadelphia Redevelopment Area.

The RDA is a "public body and a body corporate and politic" that was created under Pennsylvania's Urban Redevelopment Law, 35 Pa. Stat. Ann. §§ 1701 *et seq. See* 35 Pa. Stat. Ann. § 1703(a). The RDA is authorized, among other things, to acquire property by purchase, gift, or eminent domain; to lease and sell property; and to plan and contract with private, corporate, or governmental redevelopers, for the purpose of the elimination of blighted areas and the redevelopment of such property. *See id.* § 1701; *see also id.* § 1709.

PAID is a public authority incorporated by the City under the Economic Development Financing Law, 73 Pa. Stat. Ann. §§ 371 *et seq.* (Def. PAID's Statement of Uncontested Material Facts ("PAID's Facts") ¶ 6.) PAID is managed by the Philadelphia Industrial Development Corporation (the "PIDC"), a "private, not-for-profit Pennsylvania corporation." http://www.pidc-pa.org/about-us (last visited Nov. 4, 2011).

In July 1996, in accordance with its power of eminent domain, the RDA condemned the property located at 1425–43 North American Street, in Philadelphia. (PAID's Facts ¶ 7; Def. PAID's Mot. for Summ. J. on Pl.'s Claims ("PAID's Mot. for Summ. J.") Ex. D.) On December 15, 2000, Sterling executed a land-reservation agreement in which the PIDC agreed to reserve the property for purchase by Sterling. (*See* PAID's Mot. for Summ. J. Ex. E.) In its letter describing the terms and conditions of the land reservation, the PIDC explained that the reservation was "subject to review and comment by the RDA," which was holding the property for PIDC and

---

[1] Except as otherwise noted, the following facts are undisputed.

PAID, and was "subject to their Redevelopment Agreement." (*Id.* at 1.) The PIDC asserted that during the reservation period, Sterling was expected to "prepare a set of schematic plans, including a site plan, soil erosion and sedimentation plan, [and] a landscaping plan, [and] execute the RDA Redevelopment Agreement, and a financing commitment satisfactory to PIDC, if applicable." (*Id.*) The PIDC advised Sterling to "review the zoning of the site in order to make certain that you can legally use it for your intended purposes . . . and satisfy yourself as to the environmental condition of the site" because "[t]his property is being sold 'as is' and neither RDA, PIDC nor PAID will indemnify the buyer for any site conditions whatsoever." (*Id.*)

Sterling wanted to purchase the property to build a facility for his cement masonry business and to create and develop a training program for cement mason workers. (PAID's Facts ¶ 10; Def. RDA's Mot. for Summ. J. ("RDA's Mot. for Summ. J.") Ex. I, Dep. of Leroy Sterling (Oct. 19, 2010) ("Sterling Dep.") at 22:21–26:13.)

On August 22, 2002, the RDA entered into a redevelopment agreement with PAID, under which PAID was to develop the property. (RDA's Mot. for Summ. J. Ex. B ("Redevelopment Agreement").) The agreement provided that PAID, referred to in the agreement as the "Redeveloper," was to begin the development of the property within three months and was to complete the development, "to the satisfaction of the [RDA]," within eighteen months. (*Id.* ¶ 3.7.) The Redeveloper was responsible for securing and paying for any required permits, licenses, approvals, and variances, but the RDA agreed to assist the Redeveloper in securing them. (*Id.* ¶ 3.6.) The agreement granted the RDA a "right of re-entry"; in the event of default, including the Redeveloper's failure to complete the development of the property in the time specified in the agreement, the RDA could, after proper notice to the Redeveloper and the

Redeveloper's failure to cure the default in the specified time, "enter into the Premises or any appurtenant easement and, by this entry terminate the estate that had been conveyed by the [RDA] to the Redeveloper by such deed and revest title to the Premises or any appurtenant easement in the [RDA] absolutely." (*Id.* ¶ 5.5.)[2] The agreement also included a power of attorney in which the Redeveloper appointed the RDA as its "true and lawful attorney[ ] . . . to enter into and take possession of the Premises and appurtenant easements . . . and to grant, bargain and sell the same or any part thereof, . . . and to make, execute, acknowledge and deliver[] good and sufficient deeds and conveyances for the same." (*Id.* ¶ 5.7.)

The agreement provided that "[n]one of the provisions in this Agreement shall be deemed or are intended to be merged by reason of any subsequent deed, and any subsequent deed which shall be recorded shall not be deemed to affect or impair the provisions, obligations and covenants of this Agreement." (*Id.* ¶ 6.4.)

The RDA conveyed the property located at 1425–43 North American Street to PAID by deed on September 10, 2002. (*See* RDA's Mot. for Summ. J. Ex. D.) The deed and a "Memorandum of Redevelopment Agreement" were recorded on September 18, 2002. (*See id.* Exs. C and D; PAID's Facts ¶ 20.)

On September 10, 2002, PAID assigned its rights and obligations under the Redevelopment Agreement with the RDA to Sterling. (PAID's Facts ¶¶ 21–23.) Sterling agreed, in an Amendatory Agreement with the RDA and PAID, to "assume and perform all of the terms

---

[2] The Urban Redevelopment Law provides that the contract between the redevelopment authority and the developer shall contain, among other provisions, "[a] guaranty of completion of the redevelopment project within specified time limits, which guaranty shall include provisions for the forfeiture of title, in such form and manner as the Authority may prescribe, in the event that the project is not completed timely." 35 Pa. Stat. Ann. § 1711(a)(4).

and conditions[,] obligations and requirements contained in the Redevelopment Agreement between the PIDC[3] and the [RDA]." (RDA's Mot. for Summ. J. Ex. E ("Amendatory Agreement") ¶ 2.) On the same date, PAID conveyed the property by deed to Sterling for $10,821. (PAID's Facts ¶¶ 21–22; PAID's Mot. for Summ. J. Ex. K.)

Sometime after closing, the City asked the PIDC to pay for a survey that Sterling needed in order to consolidate the individual lots that made up the property and begin development. (PAID's Facts ¶ 29.) Sterling's architect, Kenneth Brinkley, who was responsible for getting proper approvals to develop the property (PAID's Facts ¶ 26), told the City that he received the funds for the survey on June 30, 2003. (Def. RDA's Reply to Pl.'s Mem. of Law in Opp'n to Mot. for Summ. J. ("RDA's Reply Br.") Ex. S (letter from Kenneth Gordon Brinkley to Vincent Dougherty (July 3, 2003)).) And on September 15, 2003, he reportedly told the City that the survey had been completed. (*Id.* Ex. S (e-mail from Denis Murphy to Vincent Dougherty (Sept. 15, 2003, 3:48 p.m.)).) Nonetheless, as of January 31, 2005, Sterling had not developed the property, as evidenced by a letter of that date to Brinkley from Denis Murphy, who worked for the City's Empowerment Zone and held the title of American Street business organizer, in which Murphy thanked Brinkley for his "prompt attention to the problem of high weeds that [the City] reported in September" and asked whether Sterling "still intend[ed] to develop the site and what the timeline [was] for beginning construction."[4] (*Id.* Ex. T.)

---

[3] The reference to PIDC in this provision appears to be a drafting error, since the Amendatory Agreement is otherwise clear that the referenced redevelopment agreement is the August 22, 2002, agreement between the RDA and PAID.

[4] As of that time, Sterling had not yet received the required zoning and building permits. (*See* Sterling Dep. at 90:1–92:10.)

Seven months later, in a letter to Sterling dated August 12, 2005, Vincent Dougherty, an assistant director of the City's Commerce Department and "the City's point person for economic development in the American Street Corridor" (RDA's Reply Br. Ex. JJ), expressed his concern about the redevelopment project, asserting that "[i]t is my understanding that you are in default of [the Redevelopment Agreement]." (PAID's Mot. for Summ. J. Ex. O at 1.) Dougherty noted that he had "seen no movement by [Sterling] towards fulfilling [his] contractual and verbal commitments regarding the development of this site." (*Id.* at 1.) According to Dougherty's letter, not only had Sterling failed to maintain the site and allowed the property to become "overgrown," but Sterling had also failed to pay real-estate taxes since his purchase of the property in 2002. (*Id.* at 2.)

On April 25, 2006, approximately three and a half years after Sterling entered into the Amendatory Agreement with the RDA and PAID, the RDA sent a notice of default to Sterling informing him that he was in default of several provisions of the Redevelopment Agreement. (*See* RDA's Mot. for Summ. J. Ex. F.) According to the notice, Sterling had failed to submit final plans for the redevelopment project in accordance with paragraph 3.2 of the Redevelopment Agreement; had failed to begin construction within three months after settlement and to complete construction within eighteen months of settlement, as required by paragraph 3.7 of the agreement; had failed to redevelop and "prosecute work vigorously" as required by paragraph 5.1(5) of the agreement; had failed to "furnish and supply a sufficiency of property, materials and workmen required to prosecute the work to completion" in accordance with paragraph 5.1(6) of the agreement; and had failed "to keep, perform or comply with the terms, provisions and covenants" of the agreement in accordance with paragraph 5.1(11). (*Id.* at 2.) Citing paragraph

6

5.2 of the Redevelopment Agreement, the RDA demanded that Sterling "proceed immediately to cure or remedy these defaults within 60 days,"[5] and advised him that if he failed to do so, the RDA would "pursue all available remedies under the Redevelopment Agreement and Amendatory Agreement, including without limitation, the right to terminate and cancel the Redevelopment Agreement and to reenter the Property and revest title to the Property to the [RDA]." (*Id.*)

Approximately eighteen months later, on November 2, 2007, the RDA, exercising its power of attorney and right of re-entry, executed a deed transferring the property back to itself.[6] (PAID's Facts ¶ 34.) The RDA notified Sterling in writing, via certified mail, on February 18, 2008, that it had exercised its power of attorney and deeded the property back to itself; Sterling received the notice on February 21, 2008. (*See* RDA's Mot. for Summ. J. Ex. H.)

On September 22, 2009, the RDA conveyed the property to defendant Crane Arts for $70,000. (*See* PAID's Mot. for Summ. J. Ex. S.)

Sterling filed this action in the Court of Common Pleas for Philadelphia County on April 15, 2010, and on May 20, 2010, the City, with the consent of all the defendants, removed the action to this court. Sterling asserts four counts. In count I, brought under 42 U.S.C. § 1983, Sterling alleges that the RDA, PAID, and the City violated the due-process clause of the

---

[5] Paragraph 5.2 of the Redevelopment Agreement provides, in relevant part, that "upon the occurrence of any event of default under this agreement by either party thereto[,] . . . such party shall, upon written demand from the other[,] . . . proceed immediately to cure or remedy such event of default, in any event, within sixty (60) days of receipt of such written demand."

[6] On February 16, 2011, approximately ten months after Sterling filed this action, the RDA sent Sterling a check, dated January 28, 2011, for $11,845.83, the amount he paid for the property plus his closing costs. (*See* Resp. of Pl. to Def. PAID's Reply to Pl.'s Resp. to PAID's Mot. for Summ. J. ("Sterling's Sur-Reply to PAID") Exs. A and B.)

Fourteenth Amendment by depriving him of his property without due process of law. In count II,

Sterling asserts breach-of-contract claims against those three defendants. Sterling alleges that the

RDA breached the Redevelopment Agreement by failing to render assistance to Sterling as

required under the agreement.[7] Sterling alleges that PAID breached an implied contract to assist

him in obtaining City contracts.[8] And Sterling alleges that the City breached an implied contract

in which the City agreed to assist and support the development of the property. In count III,

Sterling asserts a claim of conversion against the RDA. And finally, in count IV, Sterling asserts

a claim for equitable ejectment against Crane Arts.

After the parties had the opportunity to conduct limited discovery, the City filed a motion

to dismiss the claims against it for failure to state a claim under Rule 12(b)(6). I granted that

motion and dismissed the City as a party to this action in a memorandum and order dated July 27,

2011.

The RDA and PAID have now moved for summary judgment as to the claims against

them. They have also filed a motion to exclude the report and testimony of Sterling's damages

expert.

---

[7] His complaint further alleges that the RDA breached the Redevelopment Agreement by deeding the property back to itself and by providing property unsuitable to the contemplated development, but he does not address these allegations in his briefs opposing the RDA's motion for summary judgment and he thus appears to have abandoned these claims.

[8] His complaint also alleges that PAID breached the Amendatory Agreement by conveying property to him that was unsuitable for development, but he appears to have abandoned this claim.

## II.      STANDARD OF REVIEW

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). To defeat a motion for summary judgment, the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence" for elements on which it bears the burden of production, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and may not "rely merely upon bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). When evaluating a motion for summary judgment, the court "is not to weigh the evidence or make credibility determinations." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III.     DISCUSSION

Sterling asserts claims against the RDA and PAID under section 1983 as well as under state law for breach of contract and conversion.

### A.    Section 1983 (Count I)

To state a section 1983 claim, a plaintiff must demonstrate that the defendant, acting under color of state law, deprived him of a right secured by the Constitution or the laws of the United States. *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). There is no dispute that the RDA and PAID were acting under color of state law. The issue here is whether they violated Sterling's constitutional rights.

Sterling claims that the RDA's execution of the deed transferring the property back to itself (and certain related actions by the RDA and PAID) violated his rights to due process under the Fourteenth Amendment.

The RDA and PAID argue that Sterling's due-process claims are barred by the statute of limitations and that, in any event, his claims must fail on the merits as a matter of law.[9]

### 1.    The Timeliness of Sterling's Claims

Sterling's due-process claims, like all section 1983 claims, are subject to the state statute of limitations for personal-injury actions, *see Wallace v. Kato*, 549 U.S. 384, 387 (2007), which in Pennsylvania is two years, *see Sameric Corp. of Del., Inc. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998); *see also* 42 Pa. Cons. Stat. Ann. § 5524.[10] The accrual date of a section

---

[9] Although the RDA and PAID made this timeliness argument for the first time in their reply briefs, because Sterling was given an opportunity to respond and addressed this issue in his sur-replies to the RDA and PAID, I will address the timeliness of Sterling's claims here.

    The RDA and PAID also argue that Sterling's section 1983 claims are barred by *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Because I conclude that Sterling's claims fail on the merits, I do not address whether they are also barred by *Monell*.

[10] Sterling suggests that Pennsylvania's twenty-one-year statute of limitations governing possession of real property, rather than the two-year period governing section 1983 claims, should apply here. He cites no authority for such a proposition, however.

1983 claim, on the other hand, "is a question of federal law that is *not* resolved by reference to state law." *Wallace*, 549 U.S. at 388. "A section 1983 cause of action accrues when the plaintiff knew or should have known of the injury upon which its action is based." *Sameric*, 142 F.3d at 599. "The cause of action accrues even though the full extent of the injury is not then known or predictable." *Wallace*, 549 U.S. at 391.

Here, Sterling's due-process claims stem from the RDA's execution of the deed transferring the property back to itself. The RDA executed the "reverter" deed on November 2, 2007, and Sterling received notice on February 21, 2008, that the RDA had deeded the property back to itself. The two-year statute of limitations governing Sterling's claims thus began to run—at the latest—on February 21, 2008. Because Sterling did not file this action until April 15, 2010, his section 1983 claims stemming from the RDA's transfer of the property back to itself are untimely.

Sterling argues, however, that these claims are not time-barred, because the RDA's subsequent sale of the property to Crane Arts, which occurred on September 22, 2009, and was thus within the two-year limitations period, was a "continuing violation."[11]

"The continuing violations doctrine is an equitable exception to the timely filing requirement." *Cowell v. Palmer Township*, 263 F.3d 286, 292 (3d Cir. 2001) (internal quotation marks omitted). Under the doctrine, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the

---

[11] Although Sterling claimed in his complaint that the RDA's sale of the property to Crane Arts violated his due-process rights (*see* Compl. ¶ 44), he seemingly abandoned this claim in his brief opposing the motions for summary judgment. He discussed it only in his sur-reply, in his attempt to overcome the limitations problem.

11

limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." *Id.* (internal quotation marks omitted). Although the continuing-violations doctrine "has been most frequently applied in employment discrimination claims," the Third Circuit has considered its application in other contexts. *Id.* In determining whether the doctrine applies, a court should consider at least three factors: "(1) subject matter—whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency—whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence—whether the act had a degree of permanence which should trigger the plaintiff's awareness of an duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate." *Id.* And as the Third Circuit has asserted, "[t]he consideration of 'degree of permanence' is the most important of the factors." *Id.* Indeed, as another court has explained, the continuing-violations doctrine "is not suited to cases . . . where the harm is definite and discoverable, and nothing prevented the plaintiff from coming forward to seek redress." *Wilson v. Giesen*, 956 F.2d 738, 743 (7th Cir. 1992).

Here, even assuming that the sale of the property to Crane Arts could be construed as a "violation" for purposes of determining the applicability of the doctrine, the RDA's execution of the "reverter" deed had a degree of permanence that should have put Sterling on notice of his duty to assert his rights. By deeding the property back to itself, the RDA permanently deprived Sterling of his ownership interest in the property, and there was nothing to prevent Sterling from promptly asserting a claim against the RDA after he was notified of the RDA's actions.[12] The

---

[12] As to the first factor to be considered in determining whether the continuing-violations

continuing-violations doctrine is therefore inapplicable here, and Sterling's due-process claims

stemming from the RDA's execution of the deed transferring the property back to itself are time-

barred. Nonetheless, because the RDA's sale of the property to Crane Arts occurred within the

two-year limitations period, his claim stemming from that subsequent sale is still timely.

Sterling similarly argues that the failure of PAID to return the money that he paid for the

property, after the RDA deeded the property back to itself, was a continuing violation; Sterling

was not compensated until February 2011, when the RDA sent him a check for the amount he

paid for the property plus his closing costs.[13] But this argument also fails. The Third Circuit has

refused to apply the doctrine in similar contexts, concluding, for example, that the continued

existence of liens and the township's refusal to remove liens was not a continuing violation,

*Cowell*, 263 F.3d at 293, and that a defendant's continuing failure to pay amounts owed was not

a continuing violation, *Weis-Buy Servs., Inc. v. Paglia*, 411 F.3d 415, 422–23 (3d Cir. 2005). The

court has explained that "[t]he focus of the continuing violations doctrine is on *affirmative* acts of

the defendants," *Cowell*, 263 F.3d at 293 (emphasis added), and that "'[a] continuing violation is

occasioned by continual unlawful acts, not continual ill effects from an original violation,'" *id.*

(quoting *Ocean Acres Ltd. v. Dare Cnty. Bd. of Health*, 707 F.2d 103, 106 (4th Cir. 1983)).

Moreover, Sterling seems to be suggesting that the statute of limitations should be tolled until the

_____

doctrine applies, the RDA's execution of the reverter deed and its subsequent sale of the property
to Crane Arts are arguably "connected." But as to the second factor, frequency, I note that the
sale of the property to Crane Arts occurred almost two years after the RDA deeded the property
back to itself.

[13] Although Sterling arguably asserted a claim in his complaint regarding PAID's failure
to compensate him (*see* Compl. ¶ 31), he did not address it in his brief opposing PAID's motion
for summary judgment. He discussed it only in his sur-reply, in response to PAID's argument
that Sterling's section 1983 due-process claims are time-barred.

date on which he was compensated for the property. But such an approach would effectively eliminate the limitations period—if PAID never compensated Sterling, the limitations period would never run. I thus conclude that the continuing-violations doctrine does not apply here and that PAID's continuing failure to compensate Sterling does not render Sterling's claims against PAID timely.[14]

Because Sterling filed this action more than two years after the RDA notified him that it had executed a deed transferring the property back to itself, and because the continuing-violations doctrine does not apply here, Sterling's due-process claims stemming from the RDA's transfer of the property back to itself are time-barred. In any event—and to the extent that his other due-process claims are timely—his claims fail on the merits as a matter of law, as discussed in the next subsection below.

### 2.    The Merits of Sterling's Claims

Sterling claims that the RDA and PAID violated his rights to due process under the Fourteenth Amendment. The due-process clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "While on its face this constitutional provision speaks to the adequacy of state procedures," *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000), the Supreme Court has held that the due-process clause "'guarante[es] more than fair process,' and . . . cover[s] a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to

---

[14] As discussed below in connection with Sterling's substantive due-process claim against PAID, Sterling has asserted no basis for his contention that PAID should have compensated him and that its failure to do so violated his due-process rights. Accordingly, it is unclear when this claim accrued.

implement them.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting

*Washington v. Glucksberg*, 521 U.S. 702, 719 (1997), and *Daniels v. Williams*, 474 U.S. 327,

331 (1986)). Here, Sterling asserts violations of his rights to both procedural and substantive due

process. I consider each in turn.

### a.    Procedural Due Process

To sustain a claim for a violation of the procedural due-process clause, a plaintiff must

establish that "(1) he was deprived of an individual interest that is encompassed within the

Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures

available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d

225, 234 (3d Cir. 2006).

Here, Sterling claims that the RDA violated his rights to procedural due process when it

executed a deed transferring the property back to itself without proper notice or a hearing.

(Although Sterling also brings this claim against PAID, he alleges no conduct by PAID that

violated his procedural due-process rights, or any other facts in support of such a claim.)

With respect to the first element of a procedural due-process claim, there is no dispute

that ownership of real property is a property interest protected by the Fourteenth Amendment.

But "[i]t does not suffice to say that a litigant holds property. The inquiry also must focus on the

dimensions of that interest." *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 796 (1980)

(Blackmun, J., concurring).

Here, contrary to his contentions, Sterling did not have an unconditional interest in the

property. Under the terms of the Redevelopment Agreement, which Sterling agreed to "assume

15

and perform" when he signed the Amendatory Agreement (Amendatory Agreement ¶ 2), in the

event that Sterling, "in the opinion of the [RDA], fail[ed] to prosecute the work upon the

Premises vigorously with such force of workmen and mechanics as shall be satisfactory to the

[RDA]" (Redevelopment Agreement ¶ 5.1(5)), or otherwise defaulted, the RDA could, after

proper notice and an opportunity on the part of Sterling to cure the default, "enter into the

Premises or any appurtenant easement and, by this entry terminate the estate . . . and revest title

to the Premises or any appurtenant easement in the [RDA] absolutely" (*id.* ¶ 5.5).

Sterling correctly points out that the deed from PAID conveying title in the property to

Sterling contained no reference to any conditions subsequent or the RDA's right of re-entry.[15]

Nonetheless, this provision of the Redevelopment Agreement survived the delivery of the deed

and remains effective. Although the common-law doctrine of merger provides that, as a general

rule, "an agreement of sale merges into the deed and no recovery may be had based upon an

earlier agreement," *Valvano v. Galardi*, 526 A.2d 1216, 1220 n.2 (Pa. Super. Ct. 1987), this rule

is subject to certain exceptions, *see Carsek Corp. v. Stephen Schifter, Inc.*, 246 A.2d 365, 369–70

(Pa. 1968). The rule does not apply, for example, where, as here, "the intention of the parties is

otherwise." *Id.* at 370. Here, the parties clearly intended that the doctrine of merger would not

apply; the Redevelopment Agreement expressly addresses the issue and provides that "[n]one of

the provisions of this Agreement shall be deemed or are intended to be merged by any reason of

any subsequent deed, and any subsequent deed which shall be recorded shall not be deemed to

---

[15] Where, as here, "the deed provides that upon the happening of some specified event, the grantor has the right and power to terminate the estate," *Emrick v. Bethlehem Township*, 485 A.2d 736, 739 (Pa. 1984), a fee simple subject to a condition subsequent is created. "The interest held by the grantor in such cases has been termed a right of re-entry . . . [or] a power of termination." *Id.*

16

affect or impair the provisions, obligations and covenants of this Agreement." (Redevelopment Agreement ¶ 6.4.) And the Amendatory Agreement, which was signed by Sterling, provides that the "provisions of the aforesaid Redevelopment Agreement shall continue in full force and effect." (Amendatory Agreement ¶ 4.) Accordingly, the provisions of the Redevelopment Agreement survived delivery of the deed by PAID to Sterling, and the RDA retained the right of re-entry provided by the Redevelopment Agreement even after PAID conveyed the property to Sterling. *See generally* Milton R. Friedman, *Friedman on Contracts and Conveyances of Real Property* § 8.18 (7th ed. 2005) (Westlaw) (explaining that "[t]he effect of merger may be qualified by agreement" and that "a contract may effectively provide that all its provisions shall survive").

Thus, rather than holding a fee simple in the property, Sterling held a fee simple subject to a condition subsequent. Accordingly, Sterling could have no reasonable expectation of any interest in the property once he failed to develop it within the time period specified in the Redevelopment Agreement, or otherwise defaulted under the agreement, because the RDA could exercise its right of re-entry.

There is no dispute here that Sterling did not fulfill his development obligations under the agreement. And the RDA, as required by the Redevelopment Agreement, provided notice to Sterling of his default on April 25, 2006, in which it advised him that if he did not cure his default within sixty days, the RDA would pursue its remedies, including its right to re-enter the property.[16] In executing the reverter deed and transferring the property back to itself eighteen

---

[16] Sterling does not dispute that he received notice of his default. But he contends that the notice was "unlawful" and "ineffective" because the RDA could only declare PAID in default—it could not declare him in default. He asserts that the RDA should have issued the notice of default

months later, on November 2, 2007, the RDA was simply exercising its right of re-entry. And because Sterling no longer had a reasonable expectation of any interest in the property, I conclude that the exercise of this right of re-entry did not deprive Sterling of a protected property interest, and thus that Sterling was not constitutionally entitled to a hearing or other process before the RDA transferred the property back to itself. *Cf. Ruiz v. New Garden Township*, 376 F.3d 203 (3d Cir. 2004) (holding that zoning board's ruling, which required eviction of tenants within four months, did not deprive tenants of any property interest, notwithstanding that tenancy creates a property interest under Pennsylvania law, because lease could be terminated upon 30 days' notice and tenants therefore had no reasonable expectation of future occupancy beyond such 30-day period).

　　　Accordingly, this procedural due-process claim against the RDA (and PAID) must fail.

　　　Sterling also claims that the RDA's subsequent sale of the property to Crane Arts, without notice, violated his right to procedural due process. This claim must similarly fail, because Sterling has failed to identify a property interest of which he was deprived by the sale of the property. Indeed, at the time of the sale, the RDA was the owner of the property, the RDA having lawfully and properly exercised its right of re-entry and deeded the property back to itself, as discussed in more detail below in connection with Sterling's substantive due-process claims.

　　　Because neither the RDA nor PAID deprived Sterling of a protected property interest (and

---

to PAID, which in turn could have declared him in default and pursued any remedies against him. (*See* Pl.'s Mem. of Law in Opp'n to Def. RDA's Mot. for Summ. J. ("Pl.'s Resp. to RDA") at 16–17.) As discussed below in connection with Sterling's substantive due-process claims, however, there is no merit to this contention. In any event, regardless of who issued the notice of default, Sterling received actual notice, and thus, unless he timely cured the default, he could have no reasonable expectation of any interest in the property.

because Sterling's claims relating to the RDA's transfer of the property back to itself are time-barred in any event), I will grant summary judgment in favor of the RDA and PAID as to Sterling's procedural due-process claims.

**b.     Substantive Due Process**

Sterling also claims that the RDA and PAID violated the substantive component of the due-process clause.

The "core" of the concept of substantive due process has long been understood "to be protection against arbitrary action," *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998), and the Supreme Court has repeatedly emphasized that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" *id.* at 846 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)). To that end, the Supreme Court has described the "cognizable level of executive abuse of power as that which shocks the conscience." *Lewis*, 523 U.S. at 846. Thus, to sustain a substantive due-process claim, "a plaintiff must prove [that] the particular interest at issue is protected by the substantive due process clause and [that] the government's deprivation of that protected interest shocks the conscience." *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008).

*i.     The RDA*

Sterling claims that the reverter deed issued by the RDA was unlawful and that it was not a proper remedy for his default. He claims that David Auspitz, the chairman of the zoning board, was interested in his property and put pressure on Vincent Dougherty, an assistant director of the City's Commerce Department and "the City's point person for economic development in the

19

American Street Corridor" (RDA's Reply Br. Ex. JJ), who in turn pressured the RDA to issue the reverter deed. He claims that the RDA, in deeding the property back to itself, ignored the advice of counsel, and contends that the actions of those involved reflect "a brazen disregard of the law and self-dealing" in violation of the substantive due-process clause (Pl.'s Resp. to RDA at 21.)

The first question is whether Sterling's claim asserts a property interest protected by the substantive due-process clause. In analyzing Sterling's *procedural* due-process claim, I concluded that because Sterling had only a conditional interest in the property—a fee simple subject to a condition subsequent—the RDA's exercise of its right of re-entry did not deprive Sterling of a protected property interest and Sterling thus was not constitutionally entitled to a hearing or other process before the RDA exercised its right of re-entry. But to the extent that the RDA's re-entry was, as Sterling alleges here, arbitrary and improper, it arguably implicates his ownership interest in the property, an interest that is clearly subject to substantive due-process protection. *See DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 601 (3d Cir.1995) ("[O]ne would be hard-pressed to find a property interest more worthy of substantive due process protection than ownership."), *abrogated on other grounds*, *United Artists Theatre Circuit, Inc. v. Township of Warrington*, 316 F.3d 392 (3d Cir.2003).

Nonetheless, Sterling's claim fails because he cannot satisfy his burden, under the second part of the test, of presenting evidence from which a jury could reasonably find that the RDA engaged in the sort of egregious conduct that would "shock the conscience."

There is no dispute that Sterling failed to develop the property within the time specified in the Redevelopment Agreement and was in default of the agreement. And contrary to Sterling's contentions, there was nothing improper or unlawful about the RDA's exercise of its right of re-

20

entry or its execution of the deed transferring the property back to itself. Sterling makes two arguments—neither to any avail—as to why the reverter deed was unlawful.

Sterling contends first that he did not appoint the RDA as his attorney and thus that the RDA had no authority to execute the deed as his attorney in fact and convey the property back to itself. But paragraph 5.7 of the Redevelopment Agreement expressly grants the RDA a power of attorney. By entering into the Amendatory Agreement, and thereby agreeing to "assume and perform all of the terms and conditions[,] obligations and requirements contained in the Redevelopment Agreement" (Amendatory Agreement ¶ 2), Sterling irrevocably appointed the RDA his "true and lawful attorney[] . . . to enter into and take possession of the Premises and appurtenant easements . . . and to grant, bargain and sell the same or any part thereof, . . . and to make, execute, acknowledge and delivery good and sufficient deeds and conveyances for the same" (Redevelopment Agreement ¶ 5.7). Moreover, contrary to Sterling's suggestion, this power of attorney was properly executed—not only was the Amendatory Agreement signed and dated by Sterling, as required by 20 Pa. Cons. Stat. Ann. § 5601(b), but it was also witnessed and notarized.[17]

Sterling next contends that the RDA could not properly declare him in default of the Redevelopment Agreement or pursue any remedies against him, because the agreement "restricts legal default to 'parties'" and he was not a party to the agreement and "was not in privity of

_____

[17] Section 5601(b) requires that a power of attorney be witnessed by two individuals, each of whom is 18 years of age or older, only if the power of attorney is executed by mark or by another individual on behalf of and at the direction of the principal, *see* 20 Pa. Cons. Stat. Ann. § 5601(b), which was not the case here.

contract" with the RDA.[18] (Pl.'s Resp. to RDA at 16.) Sterling argues that because PAID was a party to the Redevelopment Agreement and remained obligated to the RDA even after he agreed to assume PAID's obligations under that agreement, and because, under the terms of the Amendatory Agreement, PAID expressly guaranteed the performance of his obligations, the RDA could only declare PAID in default—it could not declare him in default. Sterling contends that the RDA was advised by its legal department that it could not declare Sterling in default (*see id.* Ex. I (e-mail from Phil Kamieniecki (Mar. 6, 2006, 5:21 p.m.))), and that the RDA ignored the advice of counsel in pursuing this remedy.

There is no merit to Sterling's argument that the RDA could not declare him in default or pursue any remedies against him. While Sterling is correct that PAID remained liable to the RDA under the Redevelopment Agreement, it does not follow that the RDA's only remedies were against PAID. On the contrary, by entering into the Amendatory Agreement with the RDA and PAID and thereby agreeing to assume, as PAID's assignee,[19] PAID's obligations under the

---

[18] The Redevelopment Agreement provides, in relevant part:
[U]pon the occurrence of any event of default under this agreement by either party thereto (hereinafter sometimes "defaulting party"), such party shall, upon written demand from the other (hereinafter sometimes "aggrieved party"), proceed immediately to cure or remedy such event of default, in any event, within sixty (60) days of receipt of such written demand. If the defaulting party fails both (1) to take and diligently pursue such action and (2) to cure and remedy the event of default or breach, all within sixty (60) days after receipt of such demand, or if the event of default is such that it cannot be cured or remedied within such time, the aggrieved party may institute forwith any and all proceedings permitted by law or equity and not barred under this Agreement . . . .
(Redevelopment Agreement ¶ 5.2.)

[19] I use the term *assignee* here because that is the term used in the Amendatory Agreement. Traditionally, however, it has been said that one *assigns* rights but *delegates* duties (and the party who has assumed the duty is often referred to as the *delegate*). Often this distinction is not carefully observed, however, and the term *assignment* is sometimes used to

Redevelopment Agreement, Sterling also became liable to the RDA, and upon his default, the RDA could pursue any available remedies under the Redevelopment Agreement against him. *See* Farnsworth, *Contracts* § 11.11, at 723 ("It follows from the delegate's assumption [of the delegating party's duties] that the delegate is . . . under a duty to the obligee, as an intended beneficiary of the assumption agreement."). This is so even though the RDA did not release PAID from its obligations and PAID expressly agreed to guarantee Sterling's performance. *See id.* § 11.11, at 723–24 (explaining that as a result of an assumption, in the event of nonperformance the obligee has recourse against both the delegate, as the principal obligor, and the delegating party, as a surety).

Moreover, paragraph 6.15 of the Redevelopment Agreement provides that "[t]his agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns, including . . . any transferee of the Redeveloper," and further provides that "any reference to the [RDA] or the Redeveloper in this Agreement shall include reference to their respective successors, assigns and transferees, unless the contrary is explicitly provided." Thus, although Sterling was not an original party to the Redevelopment Agreement, as PAID's assignee he was considered a party to the agreement, and the default provisions, including paragraph 5.2 (providing for notice of default), applied to him.

There is thus no reason that the RDA could not exercise its power of attorney and right of re-entry and execute a deed transferring the property back to itself. And the RDA's legal department ultimately reached this same conclusion. (*See* Pl.'s Resp. to RDA Ex. I (e-mail from

---

refer to a transaction in which both rights are assigned and duties are delegated. *See* E. Allen Farnsworth, *Contracts* § 11.1, at 680 & n.4, § 11.10, at 717 (4th ed. 2004).

Hope Yusem (June 29, 2006, 3:25 p.m.)).)

Moreover, even assuming that David Auspitz's interest in Sterling's property influenced the RDA and that the RDA's decision to declare Sterling in default of the Redevelopment Agreement and to exercise its right of re-entry was based on an improper motive, as Sterling contends, the Third Circuit has made it clear that "merely alleging an improper motive is insufficient [for purposes of the "shocks the conscience" standard], even where the motive is unrelated to the merits of the underlying decision." *Chainey*, 523 F.3d at 220; *cf. United Artists Theatre Circuit*, 316 F.3d at 400 (describing the "improper motive" test as "less demanding" than the "shocks the conscience" standard). Indeed, in cases such as this one, the Third Circuit has failed to find conscience-shocking behavior in the absence of allegations of corruption, self-dealing, bias against an ethnic group, or similar facts. *See Eichenlaub v. Township of Indiana*, 385 F.3d 274, 286 (3d Cir. 2004) (holding that alleged misconduct did not pass the "shocks the conscience" test where plaintiffs alleged that zoning officials applied subdivision requirements to their property that were not applied to other parcels, pursued unannounced and unnecessary inspection and enforcement actions, delayed permits and approvals, improperly increased tax assessments, and maligned and muzzled them, but there was no allegation of corruption or self-dealing and officials were not accused of seeking to hamper development in order to interfere with otherwise constitutionally protected activity at the project site or because of some bias against an ethnic group); *see also Whittaker v. County of Lawrence*, No. 10-1138, 2011 WL 2745815 (3d Cir. July 15, 2011) (not precedential); *Locust Valley Golf Club, Inc. v. Upper Saucon Township*, 391 F. App'x 195 (3d Cir. 2010) (not precedential); *Highway Materials, Inc. v. Whitemarsh Township*, 386 F. App'x 251 (3d Cir. 2010) (not precedential). And although

24

Sterling asserts that the RDA's re-entry onto his property was accomplished "against a background of self-dealing" (Pl.'s Resp. to RDA at 22), he has proffered no evidence to raise a genuine issue of material fact concerning self-dealing or corruption here.[20] Similarly, even if, as Sterling suggests, the RDA's counsel ultimately concluded that the reverter deed was a proper remedy as a result of pressure from Dougherty or others, I see no basis for a jury to find that the RDA engaged in the sort of egregious conduct that would "shock the conscience"—particularly given that counsel's conclusion is, as I have demonstrated, legally correct.

Because a jury could not reasonably find that the RDA engaged in the sort of egregious conduct that would "shock the conscience," Sterling's substantive due-process claim against the RDA must fail. And, as previously discussed, this claim is time-barred in any event. Accordingly, I will grant summary judgment in favor of the RDA as to this claim.

### ii.   PAID

Finally, Sterling claims that PAID's failure to return the money that Sterling paid for the property, after the RDA deeded the property back to itself, "shocks the conscience" and violated his rights to substantive due process. The problem, however, is that Sterling has asserted no basis

---

[20] Sterling points to an e-mail from Vincent Dougherty to Tom Dalfo at the PIDC in which Dougherty asked that a notice of default be sent to Sterling, asserting, "I hate to press you guys after RDA was unresponsive for almost 6 months, but . . . Dave Auspitz is killing me on this! (Pl.'s Resp. to RDA Ex. I (e-mail from Vincent Dougherty (Mar. 8, 2006, 10:10 a.m.)).) In addition, Denis Murphy testified that Dougherty had told him that Auspitz "was interested in locating his baking portion of his cookie business on American Street" and that he was interested in Sterling's property. (RDA Mot. for Summ. J. Ex. L, Dep. of Denis Murphy (Feb. 25, 2011) at 20:5–21:5; *see also* Pl.'s Resp. to RDA Ex. I (Dep. of Vincent Dougherty (Jan. 5, 2011) at 67:10–71:19 (testifying about his e-mail)).) But this evidence is not enough to support a finding of self-dealing or corruption. I also note that Sterling has not adduced any evidence that Auspitz had an interest in, or was otherwise associated with, Crane Arts, which purchased the property from the RDA after the RDA deeded the property back to itself.

for his contention that PAID should have returned the money. It was the RDA, not PAID, that

reclaimed the property. And nothing in the Amendatory Agreement that Sterling entered into

with the RDA and PAID requires PAID to compensate Sterling in the event that the RDA

exercises its right of re-entry. Moreover, even if the agreement did require PAID to compensate

Sterling, any claim that Sterling had against PAID for its failure to compensate him would

arguably sound in breach of contract, not substantive due process. Indeed, the Third Circuit, like

other circuits, has declined to extend substantive due-process protection to state-created property

rights such as contract rights. *See Nicholas*, 227 F.3d at 140–43 (discussing the nature of property

interests that are "fundamental" under the Constitution and therefore subject to substantive due-

process protection, and concluding that a state-created contract right to public employment is not

fundamental and therefore not entitled to substantive due-process protection); *Reich v. Beharry*,

883 F.2d 239, 243–44 (3d Cir. 1989) (holding that lawyer's right to payment for services

rendered to state was not entitled to substantive due-process protection).

Sterling's substantive due-process claim against PAID must therefore fail, and I will grant

summary judgment in favor of PAID as to this claim.[21]

---

[21] Although in his briefs Sterling seems to challenge only *PAID's* failure to compensate him, to the extent that his complaint may also be read as challenging, on substantive due-process grounds, the *RDA's* failure to compensate him (*see* Compl. ¶ 31), such a claim must similarly fail.

Sterling's right to compensation, to the extent that he has such a right in the event that the Redevelopment Authority exercises its right of re-entry, is governed by paragraph 5.8 of the Redevelopment Agreement, which requires the RDA, upon exercising its right of re-entry, to use its best efforts to resell the property and provides that the proceeds of such a sale shall be applied "first, to reimburse the [RDA] . . . for all costs and expenses incurred" and "second, to reimburse the Redeveloper up to the amount equal to the sum of the purchase price paid by it for the Premises . . . and the monies actually invested by it in making any of the improvements on the Premises or part thereof, less any gains or income withdrawn or made by it from this Agreement." (Redevelopment Agreement ¶ 5.8.) As discussed above, however, such contract

B.       **Breach of Contract (Count II)**

Next, Sterling asserts breach-of-contract claims against the RDA and PAID.

1.       **The RDA**

Sterling claims that the RDA breached paragraph 3.6 of the Redevelopment Agreement, under which the RDA agreed to assist him in securing any permits, licenses, approvals, and variances required for his development of the property. And he contends that because of difficulties in obtaining the necessary permits and approvals, he was unable to develop the property within the eighteen-month time period specified in the Redevelopment Agreement.[22]

The RDA argues that Sterling's claim must fail and that it is entitled to summary judgment because Sterling never asked the RDA for assistance—the RDA contends that any requests by Sterling for help were directed to the City of Philadelphia.

Because I conclude that the Redevelopment Agreement is ambiguous as to whether the RDA had an affirmative duty to provide assistance even in the absence of a request by Sterling for assistance, and "thus presents a question of interpretation for a jury," *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009), I will deny the RDA's motion for summary judgment as to this claim.

"The paramount goal of contractual interpretation is to ascertain and give effect to the

rights are not entitled to substantive due-process protection.

[22] Sterling did not receive a zoning permit until July 17, 2006, more than three and a half years after he entered into the Amendatory Agreement with the RDA and PAID and purchased the property, and almost three months after the RDA sent him a notice of default. He never received a building permit. (*See* Sterling Dep. at 90:1–92:10.) Brinkley filed a zoning application on June 3, 2003 (*see* RDA's Mot. for Summ. J. Ex. J, Dep. of Kenneth Brinkley (Nov. 22, 2010). at 62:4–64:7), but it is not clear from the record when he applied for a building permit.

intent of the parties." *Morningstar v. Hallett*, 858 A.2d 125, 129 (Pa. Super. Ct. 2004). "Where the meaning of a written contract is clear and unambiguous, its interpretation and construction are for the court, not the jury." *Hewes v. McWilliams*, 194 A.2d 339, 342 (Pa. 1963). But "where the language chosen by the parties is ambiguous, deciding the intent of the parties becomes a question of fact for a jury." *Am. Eagle Outfitters*, 584 F.3d at 587 (citing *Cmty. Coll. of Beaver Cnty. v. Cmty. Coll. of Beaver Cnty., Soc'y of the Faculty*, 375 A.2d 1267, 1275 (Pa. 1977)).

Thus, as a preliminary matter, a court must determine, as a matter of law, whether the terms of a contract are clear or ambiguous. *See id.* "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986). In determining whether a contract is ambiguous, the meaning of the contract's language should not be distorted, and "a court must not rely upon a strained contrivancy" to establish an ambiguity. *Steuart v. McChesney*, 444 A.2d 659, 663 (Pa. 1982).

In this case I cannot conclude that the Redevelopment Agreement, as the RDA implicitly argues, unambiguously imposes on the RDA an obligation to assist Sterling *only* in the event that Sterling asks for assistance. The relevant provision reads as follows:

> The Redeveloper shall secure and pay for at its sole cost and expense any and all permits, licenses, approvals and variances required by any governmental body. The [RDA] shall assist the Redeveloper in securing such permits, licenses, approvals and variances.

(Redevelopment Agreement ¶ 3.6.) Although the RDA's interpretation is not unreasonable, the provision could also be interpreted, contrary to the RDA's contention, to impose on the RDA an affirmative obligation to assist the Redeveloper in securing the necessary permits even in the

28

absence of a request by the Redeveloper for such assistance.

Given this ambiguity, I must deny the RDA's motion for summary judgment; it is for the jury to interpret the Redevelopment Agreement and determine the scope of the RDA's duty to provide assistance.[23]

## 2.     PAID

Sterling claims that PAID breached an implied contract to assist him; he claims that to induce him to enter into the Amendatory Agreement, PAID promised to assist him in obtaining City contracts as a minority contractor.[24] He testified, for example, that when he initially met with Tony Palimore, a representative of the PIDC, and others (including Denis Murphy) about developing the property, they said, "[I]f you agree to hire a percentage of your workers from the

---

[23] The RDA does not argue in its briefs that, to the extent that the City provided any assistance to Sterling, it did so on behalf of, or at the request of, the RDA. Of course, to the extent that the City did provide assistance, the RDA's failure to provide assistance might not actually have resulted in any damages to Sterling. But even if that were the case, summary judgment in favor of the RDA would not be appropriate—as Pennsylvania courts have explained, "[a] cause of action exists even if no compensable loss can be shown because any breach gives rise to at least nominal damages," *Grabowski v. Quigley*, 684 A.2d 610, 617 (Pa. Super. Ct. 1996); *see also Labware, Inc. v. Thermo Labsystems, Inc.*, No. 04-2545, 2005 WL 1541028, at *12–13 (E.D. Pa. June 29, 2005). As to Sterling's claimed damages, the RDA has filed a motion seeking to exclude the report and testimony of Sterling's expert. I address that motion in subsection D below.

[24] Under count II of his complaint (breach of contract), Sterling alleged only that PAID had breached the Amendatory Agreement by "conveying a parcel to plaintiff unsuitable for the development, as all parties had agreed to." (Compl. ¶ 55.) Nonetheless, his complaint may fairly be read as including the claim he now asserts, since he also alleged more generally that "Municipal Defendants [referring collectively to the RDA, PAID, and the City] promised they would procure contracts for masonry work for Plaintiff to assist him in successfully operating his enterprise and his training program" (*id.* ¶ 14), and that "Municipal Defendants broke their promise to assist Plaintiff in procuring contracts, said promise being made to induce Plaintiff to enter into the agreements with Municipal Defendants pertaining to the Premises" (*id.* ¶ 35).

area, I will see to it that you will get a piece of the action of the development in the area to carry

and help you, assist you with the people that you hire, and that's how I went." (Sterling Dep. at

21:20–24.)

Even assuming, for purposes of PAID's summary-judgment motion, that an implied

contract exists, Sterling's claim must fail because he never built his masonry business on the

property and there is no evidence that he hired workers from the area or bid on any City

contracts. I will therefore grant summary judgment in favor of PAID as to this claim.

### C.    Conversion (Count III)

Sterling lastly asserts a claim against the RDA for the common-law tort of conversion.

"[C]onversion is the deprivation of another's right of property in, or use or possession of,

*a chattel*, or other interference therewith, without the owner's consent and without lawful

justification." *Stevenson v. Econ. Bank of Ambridge*, 197 A.2d 721, 726 (Pa. 1964) (emphasis

added).

Here, Sterling claims that the RDA unlawfully took, or converted, his property, arguing

that the "reverter" deed was unlawful. This claim must fail, however, because real property

cannot be the subject of an action for conversion. *See* 18 Am. Jur. 2d *Conversion* § 15; 90 C.J.S.

*Trover and Conversion* § 17; *cf. Norriton East Realty Corp. v. Central-Penn Nat'l Bank*, 254

A.2d 637 (Pa. 1969) (asserting that if gas ranges, air conditioners, and refrigerators in apartment

building were fixtures and part of the real estate, they could not be the subject of an action for

conversion).

Apparently conceding that the tort of conversion does not apply to real property, Sterling

30

now argues that the RDA's deeding of the property back to itself constituted theft. But his claim

fares no better under this reasoning, because there is no private cause of action for theft. *See*

*Schwartz v. Steven Kramer & Assocs.*, No. 90-4943, 1995 WL 3673 (E.D. Pa. Jan. 4, 1995)

(finding no private causes of action for forgery or theft under Pennsylvania law); *Waye v. First*

*Citizen's Nat'l Bank*, 846 F. Supp. 310, 320 (M.D. Pa. 1994) (explaining that "'[t]heft' refers to

criminal conduct governed by statutory law found at 18 Pa. Cons. Stat. Ann. chap. 39").

In any event, there is no merit to Sterling's claim. As discussed in connection with his

due-process claims, there was nothing unlawful or improper about the RDA's exercise of its right

of re-entry or its execution of the deed transferring the property back to itself.

I will therefore grant summary judgment in favor of the RDA as to the conversion claim

against it.

### D.      Motion to Exclude Expert Report and Testimony

Finally, the RDA has submitted a motion to exclude the report and testimony of Sterling's

damages expert, Bradley R. Ryden.[25] Sterling hired Ryden, a certified public accountant, to

calculate the economic loss resulting from Sterling's inability to develop the property and operate

his cement masonry business there.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702,

which provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an

---

[25] PAID joined in the RDA's motion, but because I am granting summary judgment in
favor of PAID as to all the claims against it, I will dismiss PAID's motion to exclude Ryden's
opinion as moot.

> expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. As the Third Circuit has explained, the Federal Rules of Evidence "embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact," and Rule 702 "has a liberal policy of admissibility." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997). Nonetheless, "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit," *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000), and a district court must act as a "gatekeeper" to ensure that evidence presented by expert witnesses meets these requirements, *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."). The burden is on the proponent of the evidence—in this case Sterling—to establish admissibility by a preponderance of the evidence. *See Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999).

Here, in seeking to exclude Ryden's report and testimony, the RDA challenges the assumptions or factual basis underlying Ryden's analysis.

Ryden calculated Sterling's economic loss as the difference between his projected net income had he developed the property and his actual net income from his existing masonry business, for 2006 through 2010. (*See* RDA's Mot. to Exclude the Report & Testimony of Bradley R. Ryden, CPA ("RDA's Mot. to Exclude") Ex. A ("Ryden Report").) Using two sets of

revenue projections (a "low end" and a "high end"), Ryden estimated Sterling's lost income over this five-year period to be between $100,705 and $328,428. (*See id.* Sched. 1.) The problem, according to the RDA, is that Ryden based his revenue projections solely on Sterling's estimates as to the amount of revenue his business could have generated had he been able to obtain the necessary permits and approvals and develop the property.

      "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004). But where "the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury," it must be excluded. *Id.* That is, "an expert's testimony . . . must be accompanied by a sufficient factual foundation before it can be submitted to the jury." *Elcock*, 233 F.3d at 754 (internal quotation marks omitted). Thus in *Benjamin v. Peter's Farm Condo. Owners Ass'n*, 820 F.2d 640 (3d Cir. 1987), which the *Elcock* court cited, the Third Circuit held that expert testimony as to the plaintiff's prospective earnings loss should have been excluded because it was based only on the plaintiff's "personal belief" as to his potential earnings and was therefore "without proper foundation and insufficient for a jury properly to assess [the plaintiff's] damages." 820 F.2d at 643 (characterizing the expert's calculation as a "castle made of sand"); *see also, e.g.*, *US Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 691 (8th Cir. 2009) (concluding that district court did not abuse its discretion in excluding expert testimony where expert "relied almost exclusively on [plaintiff's] speculative estimates without any independent verification; he conducted little if any investigation or analysis of market conditions; and he revised his opinion on damages dramatically from $1,800,000 to a range of $600,000 to $1,060,000").

Similarly, here, Ryden testified that he relied solely on Sterling's estimates of projected revenue (*see* RDA's Mot. to Exclude Ex. B, Dep. of Bradley Ryden (May 20, 2011) ("Ryden Dep.") at 10:22–11:4), and because these estimates are merely speculative, and have no factual basis, Ryden's report and testimony must be excluded.

At the low end, Sterling estimated his projected revenue, had he been able to develop the property, to be $150,000 in 2006, $250,000 in 2007, $300,000 in 2008, $300,000 in 2009, and $350,000 in 2010. At the high end, he estimated his projected revenue to be $250,000 in 2006, $400,000 in 2007, $500,000 in 2008, $500,000 in 2009, and $550,000 in 2010. By comparison, Sterling's actual revenue for his existing masonry business was $50,415 in 2006, $159,696 in 2007, $235,125 in 2008, $86,793 in 2009, and $46,239 in 2010. (*See* Ryden Report Sched. 4.)

According to Ryden's report, Sterling's revenue projections were based on several assumptions. First, Sterling told Ryden that "the new site would have provided better access for the trucks" and that "the new set-up would have been much more efficient than the operations he had and currently has." (*Id.* at 2.) Second, Sterling "stated that he would have made an agreement with the City of Philadelphia and PIDC and become one of their sponsored contractors," which would have "increased his business significantly." (*Id.*) He explained that a City ordinance required the City to hire a certain percentage of minority contractors for City construction projects, and he "was certain he would [have been] able to increase his business significantly, if the [C]ity of Philadelphia had assisted him as promised." (*Id.*) Sterling suggested that he was not currently benefitting from the minority-contracting requirement because he "was forced to operate out of a rental facility that was inadequate." (*Id.*) Third, Sterling told Ryden that "between approximately 2003 and 2006, the [C]ity of Philadelphia (particularly American Street)

34

experienced a building boom," and Sterling believed that "he would have received multiple jobs through that time period, thus increasing his revenue." (*Id.*) Sterling suggested to Ryden that "he could have had a thriving business, as his competitor Wm. Proud Masonry now has." (*Id.* at 3.) According to Sterling, "Wm. Proud Masonry, located on American Street in Philadelphia, Pennsylvania, was a small masonry/restoration company that started out with only a pickup truck" but now "has a thriving business and is a part of PIDC." (*Id.*) Sterling asserted that "[t]hey are now receiving a large amount of their work from PIDC and have increased their business significantly over the past 10 years." (*Id.*)

Sterling has adduced no evidence to support his assumptions and projections, however, and Ryden did not independently investigate their reasonableness. Ryden testified, for example, that he did not inspect Sterling's current facility or the property on American Street. (Ryden Dep. 16:20–17:2.) Nor was Ryden aware of the number of minority contractors performing masonry work in the City of Philadelphia (*id.* at 14:17–24), or the number of jobs that the City funded during this period (*id.* at 15:1–3). Although Ryden attempted to conduct an investigation regarding Wm. Proud Masonry, he testified that he was unable to find any useful information and that he was unable to verify how much business the company was doing or its income. (*Id.* at 28:19–30:14.)

Moreover, when asked whether the economy had had any effect on Sterling's revenue in 2009 and 2010—Sterling's revenue decreased from $235,125 in 2008 to $86,793 in 2009 and $46,239 in 2010, but Sterling nonetheless projected revenue of $300,000 in 2009 and $350,000 in 2010 at the low end—Ryden replied, "I don't know [the] answer to that." (*Id.* at 24:14–25:1.) He said that he had asked Sterling why his revenue had decreased and that Sterling had explained

35

that "he was very distraught over this situation and really didn't work that hard to find work."
(*Id.* at 25:2–8.)

Sterling's estimates as to the revenue he would have generated had he been able to develop the property are based on nothing more than optimistic speculation. Even assuming that there is merit to Sterling's assumptions that his development of the property would have allowed him to generate additional revenue, he has offered no evidence to support the magnitude of his projected increases. And Ryden's unqualified acceptance of Sterling's projections without verification or investigation renders his opinion too speculative to offer any assistance to the jury. I will therefore grant the RDA's motion to exclude Ryden's report and testimony.

## III.   CONCLUSION

For the reasons set forth above, I will grant the RDA's motion for summary judgment as to the section 1983 and conversion claims against it, but I will deny its motion as to the breach-of-contract claim against it, and I will grant PAID's motion for summary judgment as to all claims against it. I will also grant the RDA's motion to exclude the report and testimony of Ryden regarding damages. An appropriate order accompanies this memorandum.